FILED
SEP 06 2005
USDC WP SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JEAN ZIPERSKI,

      Plaintiff,

    – against –

FIRST UNUM LIFE INSURANCE COMPANY,

      Defendant.
----------------------------------------------------------------x

NOTICE OF REMOVAL

**05 CIV. 7798**

**JUDGE COTE**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441, *et seq.*, defendant, First Unum Life Insurance Company ("First Unum"), by its attorneys, Begos & Horgan, LLP, hereby removes this action to the United States District Court for the Southern District of New York upon the following grounds:

1. First Unum is named in a civil action brought against it in the Supreme Court for the State of New York, County of New York, entitled *Jean Ziperski v. First Unum Life Ins. Co.*, Index No. 05-111368 ("Removed Action"). A copy of the Summons and Complaint is annexed hereto.

2. Plaintiff alleges that she is entitled to benefits under a Long Term Disability Benefits Conversion plan ("Conversion Plan"). First Unum issued the Conversion Plan to plaintiff, pursuant to the terms of a Group Long Term Disability Insurance Policy ("LTD Policy") that First Unum had issued to plaintiff's employer, Morgan Stanley Dean Witter & Co. ("Morgan Stanley").

3. Specifically, the LTD Policy contained a "conversion privilege" allowing participants "to obtain converted disability income coverage without medical evidence of insurability." LTD Policy, § 5C).

4. Morgan Stanley established the LTD Policy to provide an employee benefit to its employees. There is no question that the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), governs claims under that Policy.

5. The Second Circuit has held that ERISA would also govern plaintiff's right to obtain the Conversion Plan, and Morgan Stanley's and First Unum's obligations to issue the Conversion Plan. *Howard v. Gleason Corp.,* 901 F.2d 1154 (2d Cir.1990). The Second Circuit has not ruled on the question whether ERISA governs a claim for benefits under a plan such as the Conversion Plan.

6. The Eighth and Eleventh Circuits have ruled that ERISA *does* govern a claim, like plaintiff's, to benefits under a conversion plan. *Painter v. Golden Rule Ins. Co.,* 121 F.3d 436, 440 (8th Cir.1997) ("the Conversion Policy is a component of M.D. Care's ERISA plan. A suit to recover Conversion Policy benefits is governed by" ERISA); *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1347 (11th Cir.1994) (Plaintiff's "ability to obtain the converted life insurance policy arose from the ERISA plan, and the converted policy itself continued to be integrally linked with the ERISA plan"). In contrast, the First and Ninth Circuits have ruled that ERISA did not govern the claims for benefits under the conversion plans at issue in those cases. *Demars v. CIGNA Corp.,* 173 F.3d 443 (1st Cir.1999); *Waks v. Empire Blue Cross/Blue Shield,* 263 F.3d 872 (9th Cir.2001).

7. Plaintiff's complaint alleges that ERISA does not govern her claim under the Conversion Plan, citing *Arancio v. Prudential Ins. Co.,* 247 F.Supp.2d 333 (S.D.N.Y.2002). That case is not binding on this Court. Moreover, insofar as *Arancio* might be considered persuasive, it is distinguishable. Specifically, it based its ruling on the finding that the conversion policy at issue in that case "is the same as any other individual policy." 247 F. Supp. 2d at 336. In contrast, the Conversion Plan issued to Ms. Ziperski is most certainly *not* "the same as any other individual

policy." In particular, it was issued without Ms. Ziperski providing evidence that she was insurable; it explicitly refers to, and expressly incorporates, several terms from the LTD Policy; and it does not incorporate exclusions that are in First Unum's individual policies (such as pre-existing condition exclusions). This is precisely the type of conversion plan that the Eleventh Circuit held is governed by ERISA:

> The conversion in the instant case ... did not actually create an individual policy. ... Clearly, Hostetter's ability to obtain the converted life insurance policy arose from the ERISA plan, and *the converted policy itself continued to be integrally linked with the ERISA plan*. In this case, conversion of the Elect life coverage did not defeat ERISA regulation [emphasis added].

*Glass v. United of Omaha Life Ins. Co., supra*, 33 F.3d at 1346-47.

8. As the coverage under which plaintiff seeks to recover was integrally linked with the LTD Plan, plaintiff's claim would appear to "fall[] directly under § 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). The Supreme Court held in *Taylor* – in which a disability claimant sought to recover damages under state law for the termination of disability benefits – that: "this suit, though it purports to raise only state law claims, is necessarily federal in character[.] ... It, therefore, 'arise[s] under the ... laws ... of the United States,' 28 U. S. C. § 1331, and is removable to federal court by the defendants, 28 U. S. C. § 1441(b)." 481 U.S. at 67, 107 S. Ct. at 1548. *See also Midpoint Service Provider, Inc. v. Cigna*, 256 F.3d 81, 83 (2d Cir. 2001) ("when a claim asserted in state court is preempted by the civil enforcement provisions of ERISA, removal is allowed on the basis of federal question jurisdiction"); *Johnson v. First Unum Life Ins. Co.*, 914 F. Supp. 51 (S.D.N.Y. 1996) ("ERISA preempts state

claims involving improper handling of claims for employee benefits and thus provides a sufficient basis for removal [*citing Taylor*]").

9. Accordingly, and as the Removed Action, though pled as an action under state law, arises under the laws of the United States, this Court has original jurisdiction over it pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), and it is an action which may be removed to this Court pursuant to 28 U.S.C. § 1441.

10. As First Unum received a copy of the Summons and Complaint on August 15, 2005, this Notice is timely filed pursuant to 28 U.S.C. § 1446(b).

WHEREFORE, defendant, First Unum Life Insurance Company, hereby removes this action to this Court.

Dated:   Bronxville, New York
         September 6, 2005

                                          BEGOS & HORGAN, LLP

                                          By: _____
                                               Patrick W. Begos (PB4372)
                                          Attorneys for Defendant
                                          7 Pondfield Road
                                          Bronxville, NY 10708
                                          (914) 961-4441

08/17/05  10:11 FAX 207 575 4387          LGL                                    ☒002

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------X
JEAN ZIPERSKI,                                          |   Filed: 8/15/05
                                                        |   Index No.: 05-11368
                              Plaintiffs,               |
                                                        |
        - against -                                     |   SUMMONS
                                                        |
FIRST UNUM LIFE INSURANCE COMPANY,                      |   Plaintiff's Address:
                                                        |   225 Central Park West
                              Defendants.               |   Apartment 914
-------------------------------------------------------X    New York, New York 10024

TO THE ABOVE NAMED DEFENDANT:

   **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorney an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

   Plaintiff designates New York County as the place of trial. The basis of venue designated is the residence of Plaintiff, as set forth above.

Dated: August 12, 2005
       Ronkonkoma New York

                                                        BINDER AND BINDER, P.C.,

         RECEIVED                              By:      _____
          AUG 1 6 2005                                  Harry J. Binder, Esq.
                                                        Attorneys for Plaintiff
         PTL LEGAL                                      2805 Veterans Memorial Highway
                                                        Suite 20
                                                        Ronkonkoma, New York 11779-7682
                                                        (631) 648-4700

Defendant's Address:
First Unum Life Insurance Company
99 Park Avenue
6th Floor
New York, New York 10016



NEW YORK COUNTY CLERK'S OFFICE
AUG 1 5 2005
NOT COMPARED WITH COPY FILED
SERVICE COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
JEAN ZIPERSKI,

       Plaintiff,       Index No.:

 – against –            COMPLAINT

FIRST UNUM LIFE INSURANCE COMPANY,   JURY TRIAL DEMANDED

       Defendant.
-----------------------------------------------------------X

  Jean Ziperski, by her attorneys, BINDER & BINDER, P.C., for her Complaint against the Defendant, First UNUM Life Insurance Company ("UNUM"), alleges as follows:

### NATURE OF ACTION

1. This action seeks a declaration that UNUM breached the terms and conditions of an individual Disability Insurance Policy, No. 00498447-001 394587444 (the "Policy"), issued to Plaintiff by wrongfully refusing to pay benefits to Ms. Ziperski.

### THE PARTIES

2. Plaintiff was born on May 31, 1959, and resides at 225 Central Park West, Apartment 914, New York, New York 10024.

3. Defendant is a business incorporated under the laws of New York, and the Insurance Department of the State of New York is authorized to accept service of process on its behalf.

### THE POLICY

4. On June 1, 2001, Plaintiff terminated her employment with Morgan Stanley (the "Employer"), where she had worked from May 1996 to May 2001 as a Vice President, earning $215,000.00 a year. During that employment, Plaintiff was covered under the Employer's Group Long Term Disability Plan, Group Plan No. 541252-002 (the "LTD Plan").

5. Exercising her right under the LTD Plan, on June 23, 2001, after leaving the Employer, Plaintiff applied to convert her coverage under the LTD Plan to an individual policy.

6.  On July 13, 2001, Defendant converted Plaintiff's coverage under the LTD Plan into an Individual Disability Policy and issued the Policy with an effective date of June 1, 2001.

7.  Because the onset of Plaintiff's disability arose after June 1, 2001, her disability claim is made under the Policy, not the LTD Plan. Accordingly, this action is not governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), Arancio v. Prudential Ins. Co. of America, 247 F.Supp.2d 333 (S.D.N.Y. 2002), and any attempt to remove it to federal court would be subject to sanctions.

8.  The Policy provides for a monthly benefit of $4,000, less other income benefits, with a minimum guaranteed monthly benefit of $400.

9.  The maximum benefit period under the Policy is until Plaintiff's 65th birthday, or until Ms. Ziperski returns to work.

10. Benefits begin after a 180-day elimination period.

11. The Policy defines "disability" as follows:

> "Disability" and "disabled" mean that because of injury or sickness:
> 1. you cannot perform each of the material duties of your regular occupation; and
> 2. after benefits have been paid for 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably fitted taking into consideration training, education or experience.

## STATEMENT OF FACTS

Pre-Claim Medical Records:

12. Plaintiff injured her back on September 11, 2001, doing volunteer work at the World Trade Center. That back injury and her emotional stress from working at the disaster site led to Plaintiff's admission, on October 30, 2001, to the Hazelden Clinic in Minnesota for alcohol dependence, depressive and anxiety disorders and back strain.

13. On November 26, 2001, Plaintiff was transferred to Hazelden in Chicago.

14. On December 17, 2001, Dr. Paul Board, the Medical Director of Hazelden, prescribed a pain clinic evaluation for Plaintiff's sciatica.

15. On February 26, 2002, Plaintiff was discharged from Hazelden.

16. A few days later, on March 4, 2002, Plaintiff went to a hospital emergency room with severe low back pain, where she was diagnosed with sciatica and spasm.

17. On March 5, 2002, an MRI of Plaintiff's lumbar spine revealed a probable neurofibroma at L5-S1.

18. On March 6, 2002, Dr. Scott Metzger, a board certified anesthesiologist who specializes in pain management, performed a nerve root block at the L5 level in an attempt to alleviate Plaintiff's lumbar radiculopathy.

19. On March 8, 2002, an MRI of Plaintiff's left shoulder revealed tendinopathy with a partial tear.

20. On March 11, 2002, in light of Plaintiff's lumbar radiculopathy with motor-sensory deficits, Dr. Bruce Rosenblum, a board certified neurologist, performed a diskectomy, hemilamectomy and medial facetectomy at the L5-S1 level.

21. On March 29, 2002, an MRI of Plaintiff's cervical spine revealed herniated discs at the C4-5 and C6-7 levels, as well as ridging at C5-6 and C6-7 levels with foraminal narrowing.

22. On May 7, 2002, Dr. Leroy Sutherland, a board certified anesthesiologist specializing in pain management, examined Plaintiff at Dr. Metzger's request. Dr. Metzger diagnosed Plaintiff with residual neuropathic pain that was treated with Neurontin and Ultracet, which caused sedation.

23. On June 28, 2002, Gary Saff, a board certified anesthesiologist specializing in pain management, diagnosed Plaintiff with neuropathic pain, and prescribed Ultracet and Neurontin.

24. On July 30, 2002, Dr. Richard Rho, who specializes in physical medicine and rehabilitation, examined Plaintiff at the request of Dr. Ellen Blye, who is board certified in internal medicine, for residual right lower extremity numbness and tingling and foot/ankle weakness. Plaintiff was still being treated with Ultracet and Neurontin. Dr. Rho concluded that Plaintiff still had right sided radiculopathy at the L5 level.

25. On September 13, 2002, Dr. Saff advised an epidural, steroidal injection for Plaintiff, prescribed Neurontin, and referred Plaintiff to Dr. Malcolm Reed.

26. On October 3, 2002, Plaintiff had another MRI of her lumbar spine because she was still experiencing low back pain that was radiating into her right leg. The MRI revealed disc

desiccation at the L5-S1 level with herniated disc material in the neural foramen that was impinging the L5 nerve root.

Plaintiff's Application:

27. According to the DICTIONARY OF OCCUPATIONAL TITLES (4th Ed. Rev. 1991) (the "DOT"), Plaintiff's former job most closely resembles that of a Vice President of a Financial Institution. Plaintiff's work tasks included: (a) directing and coordinating, through subordinate managerial personnel, activities of department, region, administrative division, or specific function of financial institution, such as lending, trusts, mortgages, investments, acting under authority and responsibility delegated by corporate executive officer; (b) coordinating activities of assigned program, such as sales, operations, or electronic financial services, determining methods and procedures for carrying out program, and assisting in interpreting policies and practices; (c) directing and conducting management studies; (d) preparing work load and budget estimates for specified or assigned operations; (e) analyzing operational reports and submitting activity reports; (f) developing and recommending plans for expansion of programs, operations, and financial activities; (g) soliciting new business and participating in community or service organizations; and (h) authorizing loans of specified types and amounts.

28. Because of her orthopedic and psychological impairments, Plaintiff has been unable to perform the material and substantial duties of her own occupation since October 30, 2001.

29. On October 14, 2002, Dr. Rho, Dr. Rosenblum and Dr. Sheldon Itzkowitz, Plaintiff's treating psychologist, completed the attending physician statements for Plaintiff.

30. On November 13, 2002, UNUM received Plaintiff's claim application for benefits under the Policy.

Post-Claim Medical Records:

31. On November 21, 2002, Dr. Saff re-examined Plaintiff and noted sensory-motor deficits and positive straight leg raises. Dr. Saff advised Plaintiff to have epidural steroidal injections.

32. On December 6, 2002, Dr. Saff gave Plaintiff an epidural steroidal injection.

33. On December 16, 2002, Dr. Noel Perin, a neurosurgeon, examined Plaintiff for a second opinion, at the request of Dr. Sutherland. The exam revealed sensory motor deficits at the L5 dermatome level. Dr. Perin advised Plaintiff to have a nerve block, just as Dr. Metzger had on March 6, 2002.

34. On December 20, 2002, Dr. Saff gave Plaintiff a second epidural steroidal injection.

35. On January 27, 2003, Dr. Saff gave Plaintiff a third epidural steroidal injection.

36. On June 4, 2003, Dr. Patricia Farrelly, a board certified surgeon, performed hernia repair surgery on Plaintiff.

37. On June 18, 2003, an MRI of Plaintiff's lumbar spine revealed that the right side of the nerve root at the L5 level had become enlarged.

38. On June 19, 2003, Dr. Ted Antonetz, podiatrist, examined Plaintiff for left foot pain at the request of Dr. Blye. Dr. Antonetz's diagnosis was a neuroma, for which he prescribed an orthodic device.

39. On July 14, 2003, Dr. Glenn Meyer examined Plaintiff, and concluded that she had significant nerve damage in her right leg.

40. On August 18, 2003, Dr. Philip Steig, Professor and Chairman of Neurosurgery at Cornell Medical School, examined Plaintiff, and diagnosed her with persistent radiculopathy at the L5 level.

UNUM's Processing of Plaintiff's Claim:

41. On September 11, 2003, Plaintiff informed Defendant that her radicular pain prevented her from focusing on work, and that without her pain medications, which made her drowsy, she could not function.

42. On September 12, 2003, Defendant asked both Dr. Rosenblum and Dr. Rho for their treatment records from June 1, 2001 forward, and each subsequently complied with that request.

43. Around the same time that Defendant requested information from Drs. Rosenblum and Rho, on September 17, 2003, Dr. Stuart Kahn, board certified in Physical Medicine &

Rehabilitation from the Beth Israel Medical Center Spine Institute, examined Plaintiff for a second opinion at the request of Dr. Blye. Dr. Kahn found that Plaintiff had sensory-motor-reflex deficits, and diagnosed her with chronic radiculitis.

44. On October 10, 2003, according to Defendant's internal records, it was unable to make a claim determination based on the medical records that it had received from Drs. Perin and Farrelly.

45. On October 20, 2003, Plaintiff called Defendant because she was concerned that her claim file might lack some medical evidence. Defendant told Plaintiff that she had to make sure that she provided all of the necessary evidence for it to review.

46. On November 19, 2003, Defendant's nurse, Letitia J. McMullin, reviewed Plaintiff's records. Ms. McMullen concluded that it would take 8 to 17 weeks to recover from her back surgery. Ms. McMullin said that Plaintiff would have difficulty with prolonged standing or walking, and could not lift more than 25 lbs. Ms. Mullin divined that Plaintiff would be able to travel at work because she had gone away on vacations after she stopped working. Ms. McMullin said that she would discuss her conclusions with Defendant's on site physician, Brian Brock, who informed the American Medical Association (the "AMA") that he is a radiologist.

47. In one of Defendant's undated internal records, Dr. Brock, who is an osteopath, "discussed" Ms. McMullin's review (presumably with Ms. McMullin), and rubber-stamped the nurse's conclusion that Plaintiff lacked a sedentary functional capacity for 17 weeks. Dr. Brock added that Plaintiff had reached maximum medical improvement.

48. On November 25, 2003, Karen Klockson, Defendant's claims handler, said the individual Policy would be void, and Plaintiff would be covered under the ERISA-governed LTD Plan, if she were disabled when she stopped working in June 2001. Because Ms. Klockson believed that there was medical support showing that Plaintiff was only totally disabled from her orthopedic condition during the March 4, 2002, through July 1, 2003 time period (in contrast to Plaintiff who alleges she has been disabled by those impairments since March 4, 2002), she asked Paul Burgos and Anne Dionne-Gross, two other UNUM claims handlers, if Plaintiff could be found disabled as of June 2001 from a psychiatric perspective.

49. On December 5, 2003, despite having requested medical records from numerous treating physicians who had certified that Plaintiff was totally disabled, and rather than seeking a medical opinion regarding Plaintiff's functional capacity, UNUM asked Ron Ponchak, a physical therapist, for his opinion.

50. On December 10, 2003, Defendant decided that a full file review was needed to see if Plaintiff was disabled from June 2001, as that would enable it to argue that ERISA applied to Plaintiff's claim.

51. In accordance with its company policy, Defendant will go to great lengths to argue that ERISA applies to disability claims because it enables UNUM to deny and terminate many more claims. Specifically, the policy provides that:

> The advantages of ERISA coverage in litigious situations are enormous: state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of benefit in question, and claims administrators may receive a deferential standard of review.

52. Under ERISA, UNUM terminates valid claims in bad faith because it knows the worst that can happen to it is that it will be liable for paying what it was obligated to pay under the policy.

53. However, also on December 10, 2003, Mr. Burgos opined that there was no evidence that Plaintiff was disabled from a psychological standpoint as of June 1, 2001. Accordingly, Defendant had no basis for contending that ERISA could apply to Plaintiff's claim. However, Mr. Burgos did opine that Plaintiff was totally disabled from a psychological perspective from October 30, 2001, and that it was reasonable to believe that Plaintiff's residual symptoms left her disabled from February 26, 2002, when she was discharged, through March 4, 2002, when UNUM found her to be totally disabled from an orthopedic perspective.

54. On December 17, 2003, Dr. S. N. Van De Mark, UNUM's psychologist, was seen in a "walk-in" regarding Plaintiff's claim. Dr. Van De Mark agreed with Mr. Burgos' opinion regarding the time frame of Plaintiff's total disability based upon psychological impairments.

55. On December 21, 2003, Plaintiff provided UNUM with a list reflecting the treatment that she had received for her medical conditions.

56. On January 7, 2004, Ms. Klockson asked Lisa Reardon, a physical therapist, to review Plaintiff's physical therapy notes, and emphasized that Plaintiff had already been found disabled from an orthopedic perspective, but only from March 4, 2002, followed by a 17 week recovery period for the surgery on March 11, 2002.

57. On January 16, 2004, UNUM's Nancy Munroe reported that Plaintiff's job title was Operations Manager, and that she was required to supervise 70 analysts, work 60-70 hours a week, travel internationally, and was responsible for the Employer's technical systems, multimillion dollar budgets and real estate deals. Ms. Munroe agreed that the hours and international travel were common for Plaintiff's position.

58. On January 16, 2004, Ms. Reardon reviewed Plaintiff's records. Taking statements in Plaintiff's treating physical therapist's records out of context, Ms. Reardon falsely alleged that Plaintiff had walked for 10 hours with back pack, and that she should have adjusted to side effects. These claims by Ms. Reardon were not true.

59. After reviewing Plaintiff's records, Ms. Reardon did a "walk-in" with UNUM's Barry Gendron, an osteopath who, according to the AMA, specializes in physiatry. Dr. Gendron rubber-stamped the opinion of UNUM's nurse that Plaintiff was disabled for only 17 weeks following her surgery.

UNUM Terminates Plaintiff's Benefits:

60. By letter dated January 27, 2004, Ms. Klockson approved Plaintiff's claim in the amount of $15,600, but only for the time period of April 28, 2002, through August 24, 2002. Ms. Klockson's letter reiterated the language from Ms. McMullin's November 19, 2003, review of Plaintiff's records, and dogmatically asserted that there was no evidence of a continuing psychological disability.

61. On July 14, 2004, Plaintiff asked UNUM to reconsider its termination of Plaintiff's benefits, and warned that the claim was not subject to ERISA.

62. By letter dated September 10, 2004, Gina Barnes of UNUM denied Plaintiff's assertion that the claim is not governed by ERISA, without any justification and consistent with its bad faith policy discussed above.

63. On March 28, 2005, Dr. Charles Rosenbloom, a board certified psychiatrist, conducted an independent medical examination of Plaintiff. Among other things, Dr. Rosenbloom concluded that Plaintiff's drinking is independent of her depression and anxiety, and noted that to facilitate a return to work, she had curtailed her pain medications, which left her in pain.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION

64. Plaintiff incorporates each and every allegation contained in paragraphs "1" through "63" herein as if fully restated herein.

65. Due to her inability to continue working in her former occupation, Plaintiff timely filed a claim for benefits pursuant to the Policy. Plaintiff's claim was accompanied by various claim forms and medical documentation from her treating physicians, all substantiating the fact that she was disabled within the meaning of the Policy.

66. By letter dated January 27, 2004, UNUM informed Plaintiff that she did not qualify for benefits under the Policy after August 24, 2004. Accordingly, Plaintiff's claim was terminated as of that date, and UNUM refused to accept any further liability under the Policy.

67. Unum's adverse determination ignored the opinions of Plaintiff's attending physicians, along with the diagnostic tests and other medical records, all of which confirmed that Plaintiff has been totally disabled since October 30, 2001, through May 9, 2005 – the date Plaintiff returned to work.

68. UNUM's review of the medical information submitted was selective and evidenced a biased self-interest.

69. Plaintiff's treating specialists found her to be incapable of working, and the records from those physicians form the great preponderance of medical evidence compiled in connection with Plaintiff's claim for benefits under the Policy. UNUM failed to provide any medical opinion by any physician who ever examined Plaintiff to contradict those offered by her treating physicians.

70.     Accordingly, UNUM has denied Plaintiff's claim for continued benefits without sufficient medical evidence to justify its decision.

71.     As a result, Plaintiff is entitled to benefits under the Policy from August 24, 2002, when UNUM terminated her benefits, through May 9, 2005, the she returned to work.

### AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION

72.     Plaintiff incorporates each and every allegation contained in paragraphs "1" through "71" herein as if fully restated herein.

73.     By virtue of its actions, UNUM breached the implied covenant of good faith and fair dealing inherent to every contract, that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. This amounts to a breach of contract separate and distinct from UNUM's wrongful refusal to pay benefits pursuant to the terms of the contract.

74.     Plaintiff has been disabled under the terms of the Policy from October 30, 2001, through May 9, 2005, the date she returned to work, as defined by the Policy. During that closed-end period of disability, Plaintiff was under the continuous care of her treating physicians for her disabling conditions.

75.     As a result, Plaintiff is entitled to benefits under the Policy from August 24, 2002, when UNUM terminated her benefits, through May 9, 2005, the she returned to work.

### AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION

76.     Plaintiff incorporates each and every allegation contained in paragraphs "1" through "75" herein as if fully restated herein.

77.     Under the terms of the Policy, premiums are waived for any period that a claimant is disabled under the Policy.

78.     Plaintiff has been, and continues to be, disabled under the terms of the Waiver of Premium provision of the Policy.

79.  As a result, Plaintiff is entitled to a Waiver of Premium benefit pursuant to the terms of the Policy, and a refund of those premiums she paid during her disability.

### AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION

80.  Plaintiff incorporates each and every allegation contained in paragraphs "1" through "79" herein as if fully restated herein.

81.  UNUM has both a common law obligation, and a statutory prohibition, against engaging in deceptive acts and practices in the conduct of its business.

82.  In the instant matter, and as a general business practice, UNUM wrongfully delayed, terminated and refused to pay disability benefits and waiver of premium claims.

83.  UNUM uses the intimate knowledge it obtains through its administering of insurance claimants such as Plaintiff to those persons' detriment to impose so much emotional, psychological and financial stress that such insured can no longer pursue their claim for benefits, as UNUM tried to do to Plaintiff.

84.  Furthermore, UNUM uses review processes and employee incentive programs aimed at identifying grounds for denying disability claims and for discontinuing payments of previously approved claims, such as Plaintiff's.

85.  Because of UNUM's widespread practice and pattern of engaging in unfair claim settlement practices, as defined by the National Association of Insurance Commissioners in "Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act," UNUM was forced to enter into an settlement agreement with the U.S. Department of Labor and most of the 50 State Insurance Regulators, including New York State, in November 2004 (the "Settlement Agreement").

86.  The Settlement Agreement requires UNUM to provide "assistance to claimants upon request that will ease and facilitate the claim submission process," and to obtain "complete medical records needed for the decision." Simply telling Plaintiff that it is her responsibility to submit proof of her disability is not consistent with that directive, but is emblematic of the unfair practices that led to the Settlement Agreement.

87. The Settlement Agreement directs UNUM to contact "an Attending Physician ('AP') where circumstances warrant," and obtain "an Independent Medical Examination ('IME') or Functional Capacity Evaluation ('FCE') in appropriate circumstances." UNUM's failure to contact any of Plaintiff's treating or Attending Physicians regarding their supporting total disability, especially when UNUM never had any doctor examine Plaintiff, is not consistent with those directives, but once again, is emblematic of the same unfair practices which led to the Settlement Agreement.

88. The Settlement Agreement directs UNUM: "When multiple conditions or co-morbid conditions are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations." Here, UNUM did precisely the opposite, as it treated Plaintiff's orthopedic and psychological impairments independently.

89. Furthermore, as noted above, UNUM intentionally misapplies ERISA to claims so as to it enable it to deny and terminate those claims. Consistent with that policy, after stating that ERISA would apply only if the onset date of Plaintiff's disability was on or before June 2001, and despite representing that the onset was October 2001, UNUM told Plaintiff that ERISA still applies to her claim.

90. UNUM's actions are willful, intentional, or show a reckless indifference equivalent thereto, and represent morally reprehensible conduct aimed at the general public and at the Plaintiff in particular. Such acts and practices have a broad impact on consumers at large who are similarly situated to Plaintiff.

91. Although not a private right of action, UNUM's conduct constitutes unfair claim settlement practice, in violation of New York Insurance Law §2601.

92. UNUM's actions are deceptive acts and practices in the conduct of its business, all in violation of New York General Business Law §349.

93. Plaintiff is entitled to punitive damages in the amount of $1,000.00 as provided by the General Business Law in instances such as the matter at bar.

94.  Plaintiff is entitled to attorneys' fees as provided by New York General Business Law §349(h), in an amount to be determined by this Court.

### DEMAND FOR TRIAL BY JURY

95.  Plaintiff hereby demands a trial by jury of all issues triable as of right.

**WHEREFORE**, Plaintiff respectfully asks this Court to enter judgment against UNUM as follows:

a.  Granting judgment against UNUM pursuant to the terms of the Policy from August 24, 2002, through May 9, 2005, the date Plaintiff returned to work, and declaring that Plaintiff was disabled within the terms and conditions of the Policy during that period of time;

b.  Declaring that the Policy was still in force and effect from August 24, 2002, through May 9, 2005, declaring that premium payments were waived pursuant to the terms of the Policy during this period of time and directing UNUM to refund any and all premium payments it received from Plaintiff during this period;

c.  Granting judgment against UNUM in an amount to be determined by this Court pursuant to the General Business Law §349 for UNUM's violation of that statute;

d.  Granting judgment for Plaintiff in an amount to be determined by this Court for attorneys' fees;

e.  Awarding Plaintiff interest, costs and disbursements for this action; and

f.  Granting Plaintiff such other and further relief as this Court may deem just, proper and equitable in the circumstances.

Dated: August 10, 2005
       Ronkonkoma, New York

                                              BINDER & BINDER, P.C.

                                       By:    /s/ Harry J. Binder
                                              Harry J. Binder, Esq.
                                              Attorneys for Plaintiff
                                              2805 Veterans Memorial Highway
                                              Suite 17
                                              Ronkonkoma, New York 11779
                                              Telephone: (631) 648-4700